

THE ATTORNEY GENERAL.

OF TEXAS

GERALD C. MANN
XXXXXXXXXXXXXXXXXXXXXXX
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Honorable Geo. H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

Opinion No. 0-892
Re: Liability of certain corporations,
owning and using pipe lines for
the transportation of oil under
certain fact situations, to an ad
valorem tax on their intangible
assets under Art. 7105, R.C.S.

By your letter of May 29, 1939, you seek the opinion of this Department upon the liability of four corporations for the intangible assets tax levied by Article 7105, as amended, Vernon's Annotated Civil Statutes, under the following fact situation in each instance, which we quote from your letter:

"COMPANY A owns a gathering system which transports oil from its producing leases to the purchasing company's pipe line. They do not charge a tariff and do not separate their expenses of operating the lease from those of operating the pipe line.

"COMPANY B owns its producing lease and pipe line that transports the oil to their refinery. They do not set up a tariff and do not charge the pipe line with its portion of the expenses.

"COMPANY C operates its own lease and buys oil from other producers in that field and gathers and transports all of this oil to connecting trunk lines.

"COMPANY D gathers its own oil together with other oil purchased in the field and transports same to its own refinery for processing. This company claims that all of the oil transported belongs to it at the lease tank and therefore they charge no tariff."

Article 7105, as amended, Vernon's Annotated Civil Statutes, levies a tax on the intangible assets of certain designated corporations in the following language:

"Each incorporated railroad company, ferry company, bridge company, turnpike or toll company, oil pipe line company, and all common carrier pipe line companies of every character whatsoever, engaged in the transportation of oil, doing business wholly or in part within this State, whether incorporated under the laws of this State, or of any other State, territory, or foreign country, and every other individual, company, corporation or association doing business of the same character in this State, in addition to the ad valorem taxes on tangible properties which are or may be imposed upon them respectively, by law, shall pay an annual tax to the State, beginning with the first day of January of each year, on their intangible assets and property, and local taxes thereon to the counties in which its business is carried on; which additional tax shall be assessed and levied upon such intangible assets and property in the manner provided in this chapter. The county or counties in which such taxes are to be paid, and the manner of apportionment of the same, shall be determined in accordance with the provisions of this Chapter."

It will be noted that the foregoing statute expressly designates two corporations which could relate to the instant question, namely, "oil pipe line company" and "all common carrier pipeline companies of every character whatsoever." The question first presented is whether or not the Legislature of Texas used the two terms interchangeably to describe one corporation, that is, a common carrier pipe line company, or employed the two descriptive terms advisedly to bring within the scope of the taxing measure two distinct and separate types of corporations engaged in the pipe line business.

Although we have been unable to find any satisfactory definition or distinction by the courts in this or other states between an "oil pipe line company" and a "common carrier pipe line company," the case of Reagan County Purchasing Co. v. State, 110 S.W. (2d) 1194, resolves all doubts as to whether the Legislature by such language, intended to single out for an intangible assets tax only one corporation or two corporations pursuing different character of businesses. This case involved a suit by the State of Texas, in behalf of itself and Reagan County, against Reagan County Purchasing Company to recover ad valorem taxes alleged to be due on intangible assets of said company, assessed by the State Tax Board and certified to the Tax Assessor of Reagan County for the year 1935. The assessment was made and the suit based upon Article 7105, as amended, Vernon's Annotated Civil Statutes, and the principal defense urged by the company was that the intangible

tax law did not apply to transporters of oil by pipe lines who are not common carrier pipe line companies, and who are not incorporated oil pipe line companies in the sense that they are in the business of transporting oil for hire. Under pertinent findings of fact made by the court it appeared that the company in question, although authorized by its charter and permit to engage in the business of transporting oil by pipe line, had never engaged in the business of transporting oil for others for hire or otherwise, all of the oil which is transported through its pipe line system having been purchased by it from all of the producers in Reagan County under contracts with them, and in turn resold under pre-existing contracts to the Humble Oil and Refining Company, at a price equal to the price paid for the oil plus 20¢ per barrel on each barred delivered. Upon this state of the record, the court answered the contention of the company with the following interpretation of the intangible tax statute:

"The text of the amendment provides that: 'Each incorporated . . . oil pipe line company, and all common carrier pipe line companies of every character whatsoever, engaged in the transportation of oil, . . . in addition to the ad valorem taxes on tangible properties which are or may be imposed upon them respectively, by law, shall pay an annual tax to the State, . . . on their intangible assets and property, and local taxes thereon to the counties in which its business is carried on.' It will be observed that both 'pipe line companies' and common carrier pipe line companies are enumerated among those who are to pay the tax upon intangible assets. The language is plain, and if we are to give to it its plain meaning, we must hold that appellant comes within the enumerated classes. We are reinforced in this belief by the fact that the caption, in stating the purposes of the act, likewise uses the same terms in the same sequence. Had the Legislature intended to limit the application of the act to pipe line companies transacting the business of common carriers of oil, it could very readily have done so. The meaning is clearly expressed. 'A thing expressed puts and end to implication.'"

Although the court goes further in this case and holds that the company in question is also a common carrier pipe line company, this does not impair its ruling that Article 7105, as amended, Vernon's Annotated Civil Statutes, comprehends within its scope and terms not only common carrier pipe lines, as commonly defined by our courts, but in addition, private carrier pipe line companies.

To which of these two general classes of pipe line companies, embraced within the purview of the intangible tax act, can the four corporations mentioned in your letter be assigned? A common carrier pipe line company has been uniformly defined by the courts as one which offers its pipe line facilities or services to the public generally or holds itself out as a carrier of oil for hire. The usual accompanying attributes or powers are the right of eminent domain, and the publishing and filing with a regulatory body of tariffs or rates for the transportation of oil. As declaratory of this, the Legislature, by Article 6018, Revised Civil Statutes, has defined a common carrier pipe line as follows:

"Every person, firm, corporation, limited partnership, joint stock association or association of any kind whatsoever;

"1. Owning, operating or managing any pipe line or any part of any pipe line within the State of Texas for the transportation of crude petroleum to or for the public for hire, or engaged in the business of transporting crude petroleum by pipe line; or

"2. Owning, operating or managing any pipe line or any part of any pipe line for the transportation of crude petroleum, to or for the public for hire, and which said pipe line is constructed or maintained upon, over or under any public road or highway, or in favor of whom the right of eminent domain exists; or

"3. Owning, operating or managing any pipe line or any part of any pipe line or pipe lines for transportation to or for the public for hire, of crude petroleum, and which said pipe line, or pipe lines is or may be constructed, operated or maintained across, upon, along, over or under the right of way of any railroad, corporation or other common carrier required by law to transport crude petroleum as a common carrier; or

"4. Owning, operating or managing or participating in ownership, operation or management, under lease, contract of purchase, agreement to buy or sell, or other agreement or arrangement of any kind whatsoever, any pipe line or pipe lines, or part of any pipe line, for the transportation from any oil field or place of production within this State to any distributing, refining or marketing center or reshipping

point thereof, within this State, of crude petroleum
bought of others;

"Is hereby declared to be a common carrier and
subject to the provisions of this law. The provi-
sions of this law shall not apply to those pipe lines
which are limited in their use to the wells, stations,
plants and refineries of the owner and which are not
a part of the pipe line transportation system of any
common carrier as above defined; nor shall such pro-
visions apply to any property of such a common carrier
which is not a part of or necessarily incident to its
pipe line transportation system."

It is readily apparent that neither of the four com-
panies described in your letter are common carrier pipe line
companies under the foregoing judicial and statutory defini-
tions, because they do not hold themselves out to the public
as transporters of oil for hire. And although COMPANY C AND
COMPANY D, under the facts stated by you, do transport by
pipe line crude petroleum bought of others, and consequently,
at first blush, come within the purview of subdivision (4)
of Article 6018, Revised Civil Statutes, we believe closer
analysis will demonstrate that the pipe lines involved are
not a part of any pipe line system for the transportation of
crude oil from the place of production to any "distributing,
refining or marketing center or reshipping point," but rather
fall within the exception contained in the last paragraph of
the statute as being "limited in their use to the wells,
stations, plants and refineries of the owner."

If we are correct in our conclusion that the four
companies involved in your letter are not common carrier pipe
line companies, it but remains to be determined if they are
"oil pipe line companies," within the contemplation of Article
7105, as amended, Vernon's Annotated Civil Statutes. This
question affords more difficulty because the case of Reagan
County Purchasing Company vs. State, supra, is the only case
in Texas bearing upon this question and it unfortunately
fails to define or delimit the term "oil pipe line company"
used in the intangible tax act, but merely held that under
the facts of this particular case, the company in question
was an "oil pipe line company" within the meaning of the act.
It should be remembered, however, that under the facts of
this case the court found and held that there was a virtual
charge for the service of transporting the oil in question,
despite the fact that the oil was purchased at the well by
the pipe line company. In this connection the court spoke
as follows:

"As heretofore stated, its charter, granted subsequent to the enactment of said provision, permits the transaction of the business of a common carrier, as does its permit to do business. The profit of 20 cents per barrel stipulated in its contract with the Humble Oil & Refining Company has all the characteristics of a charge for service. It is not dependent upon the State of the market. It is fixed; and market fluctuations cannot affect it. The hazards of the market have no place in appellant's scheme of things. Its return is as definite as the compensation of employees in the office and the field. Why should the Humble Oil & Refining Company pay this definite charge in excess of the market price unless it be for transportation of the oil from the producer to the purchaser, together with incidental storage service?"

With further reference to the status of a pipe line company which transports crude oil bought of others, such as COMPANY C and COMPANY D under consideration here, the Supreme Court of the United States in United States vs. Ohio Oil Co., 234 U.S. 548, 34 Sup. Ct. 956, 58 L. Ed. 1459, commonly cited as the "Pipe Line Cases," held that a company which transports only oil that is sold to it by other producers, and which refuses to carry oil which is not sold to it on practically its own terms, is a common carrier within the meaning of an Act of Congress extending the operation of the Interstate Commerce Act to persons and corporations engaged in the transportation of oil by pipe lines. The justification of this ruling is doubtless found in the fact that a forced sale of crude petroleum by the producers to the pipe line company in order to find a market or outlet for their oil, is a subterfuge resorted to by the pipe line companies to avoid certain tax and regulatory measures, and virtually amounts to a carriage of the oil for hire.

It appears from your letter that COMPANY C "operates its own lease and buys oil from other producers in the field and gathers and transports all of its oil to connecting trunk lines," and that COMPANY D "gathers its own oil, together with other oil purchased in the field, and transports same to its own refinery for processing." Although it does not appear that the oil so purchased by each of these companies is resold, under contract, at a fixed profit per barrel as in the case of Reagan County Purchasing Company v. State, supra, or that the same conditions of monopoly and coercion exist as in the case of United States vs. Ohio Oil Co., supra, whereby the producers were forced to sell to the pipe line companies at their own terms in order to get a market for their oil, we nevertheless incline to the view, under these

authorities, that COMPANY C and COMPANY D are "oil pipe line companies" within the terms of Article 7105, as amended, Vernon's Annotated Civil Statutes, so as to be liable for the tax on intangible assets thereby levied. That each of such companies is calculated to receive a profit from transporting this purchased oil from the place of production to connection trunk lines and on to market, or to a refinery for processing, cannot be gainsaid. And this expected or possible profit may be reasonably considered as in the nature of compensation or hire for the transportation of crude petroleum by such companies as private pipe line carriers. In any event, such companies are, in effect, offering their pipe line services and facilities to another person or corporation, and to that extent may be considered "oil pipe line companies."

But we cannot bring ourselves to hold that COMPANY A and COMPANY B occupy a like status, but on the contrary, give it as our opinion that neither of such companies constitute an "oil pipe line company" within the meaning of the intangible tax statute. You state that COMPANY A "owns a gathering system which transports oil from its producing leases to the purchasing company's pipe line" and that COMPANY B "owns its producing lease and pipe lines that transport the oil to their own refinery." No oil is bought from other producers for transportation as in the case of COMPANY C and COMPANY D. We point with stress to the fact that the intangible tax statute under consideration employs the language "engaged in the transportation of oil, doing business wholly or in part within this State" as descriptive of and following the enumeration of "oil pipe line company" and "common carrier pipe line company." It would indeed be a strained construction of the statute to say that COMPANY A and COMPANY B, under the facts outlined in your letter, were engaged in the business of transportation of oil, when they own all the properties involved, including the oil run through the pipe lines, and have no dealings, contractual or otherwise, with any other person or corporation. It is our opinion that COMPANY A is in the producing business and the gathering system which is owned by it is a mere incident to such business. Similarly, the system of pipe lines which COMPANY B owns and uses for the transportation of oil from their own producing leases to their own refinery should be considered as a mere incident to their business of producing crude oil and refining or processing such oil.

The Supreme Court of the United States in the case of United States vs. Ohio Oil Co., supra, in holding that an oil company using a pipe line wholly for the purpose of conducting its own oil from its own wells in one state to its own refinery in another State was not an oil pipe line carrier

so as to be comprehended by the provisions of an Act of
Congress extending the Interstate Commerce Act to such car-
rier, expressed the conclusion which we have reached as to
COMPANY A and COMPANY B in the following apt language:

"There remains to be considered only the Uncle
Sam Oil Company. This company has a refinery in Kansas
and oil wells in Oklahoma, with a pipe line connecting
the two which it has used for the sole purpose of con-
ducting oil from its own wells to its own refinery.
It would be a perversion of language, considering the
sense in which it is used in the statute, to say that
a man was engaged in the transportation of water
whenever he pumped a pail of water from his well to
his house. So as to oil. When, as in this case, a
company is simply drawing oil from its own wells across
a state line to its own refinery, for its own use,
and that is all, we do not regard it as falling with-
in the description of the act, the transportation
being merely an incident to use at the end."

Although involving an occupation tax upon the
operators of pipe lines rather than a tax on intangible assets,
as the case under consideration, the Supreme Court of Texas
in Texas Company vs. Stephens, 103 S.W. 481, pointed to a
distinction between owners of pipe line companies who operate
for hire and those who operate merely to transport their
own commodities. The court said:

"Section 12 declares that 'every individual, joint-
stock association, company, copartnership or corporation
. . . which owns or operates a pipe line or lines within
the state of Texas, whether such pipe lines be used for
the transmission of oil, natural or artificial gas,
whether the same be for illuminating or fuel purposes
or for any other purpose, or for steam, for heat or
power, or for the transmission of articles by pneumatic
or other power, shall be deemed and held to be a pipe
line company.' It then requires quarterly reports show-
ing charges and freights within this state paid to or
uncollected by such pipe line company on account of any
business transacted by it in the capacity of a pipe
line company as defined, and that each pipe line company
engaged in conveying oil shall report, as a part of its
gross receipts, such sums as it would have been compelled
to pay for conveying oil owned by it and conveyed for
itself if it had employed some other pipe line company
to convey it. It then requires the payment of 2 per
cent on the gross receipts as shown by such report. It
is easily deduced from all of the provisions together
that the tax is levied upon those engaged in the business

of transportation by pipe lines for others for
hire or profit, and the title of the act re-
enforces this idea, in that all of the businesses
specified in it are to be conducted for profit.
To all such section 12 applies, and the position
cannot be maintained that it exempts from the
burden imposed any business of the same class;
that is, such as are engaged in serving the public
for hire.  There is no doubt that those carrying
on such businesses may be properly classified
for taxation, apart from the owners of different
businesses who, as an incident of their businesses,
use pipe lines to transport exclusively their own
commodities."

To further fortify our conclusion we point to the
provisions of Chapter 15 of Title 32, Revised Civil Statutes,
governing corporations organized under Subdivision 36 of
Article 1302, Revised Civil Statutes, "to store, transport,
buy and sell oil, gas, salt, brine and other mineral solutions
and liquified minerals."  Insofar as pertinent to the instant
question, Article 1496, Revised Civil Statutes, provides
that such corporations shall have the power:

"1.  To store and transport oil, gas, brine and
other mineral solutions, and also sand, clay and clay
products, and to make reasonable charges therefor.

"2.  To buy, sell and furnish oil and gas for
light, heat and other purposes; to lay down, construct,
maintain and operate pipe lines, tubes, tanks, pump
stations, connections, fixtures, storage houses and
such machinery, apparatus, devices and arrangements as
may be necessary to operate such pipes and pipe lines
between different points in this State."

The point we make here is that corporations organized
for the purpose of engaging in the business of transporting
crude oil by pipe line exist under an entirely independent
purpose clause than do corporations engaged in the different
business of producing crude petroleum, and are subject to
special statutory regulations.  And to our minds, it was
such a corporation, created for the purpose of engaging in
the business of transporting crude petroleum by pipe lines,
rather than a corporation created for the purpose of produc-
ing crude petroleum or for the purpose of refining crude
petroleum and incidentally using pipe lines to this end, which
was within the contemplation of the Legislature when they
used the term "oil pipe line company" in the intangible tax
statute.  That a corporation owning and operating pipe lines

in the business of transporting crude petroleum is to be distinguished from a corporation engaged in another business such as the producing business or the refining business, and owning and operating pipe lines as an incident of and to such business, is made plain by Article 1503, Revised Civil Statutes, which provides as follows:

"Nothing in this chapter shall preclude the ownership or operation by any corporation, of private pipe lines in and about its refineries, fields or stations, even though such corporation may be engaged in the producing business."

In summation, it is the opinion of this Department that COMPANY A and COMPANY B, as described in your letter, are not liable for the ad valorem tax on their intangible assets, levied by Article 7105, as amended, Vernon's Annotated Civil Statutes, because they are neither an "oil pipe line company" or a "common carrier pipe line company" within the statute. But with reference to COMPANY C and COMPANY D, we are of the opinion that although they are not "common carrier pipe line companies," they are each an "oil pipe line company" within the statute so as to be and become liable to such tax on their intangible assets.

You ask if our ruling would be altered should any or all of these companies charge and publish a tariff for gathering and transporting this oil. Our answer is in the negative. The charging and publishing of a tariff for the transportation of crude oil for the public for hire, subject to revision by regulatory boards and commissions, is one of the indicia of a common carrier pipe line company, but is not necessarily present in the case of private carriers of petroleum by pipe lines, because the compensation or hire in such cases is generally controlled by contract. It is difficult to conceive any reason why the four companies involved here should operate under a tariff for the transportation of oil, as the term is commonly understood, but even should they do so it would not change their status, under the basic facts of their operations hereinabove discussed.

You further point out that in the case of each of the four companies mentioned, the United States of America, through its Internal Revenue Department, collects a transportation tax of 4% on the gross revenues. This has no bearing upon the foregoing opinion because the tax under consideration here is levied by the State upon corporations engaged in a certain designated business, while the transportation tax levied by the United States of America is an excise tax upon the mere act or privilege of transporting oil

in a pipe line.  In the former case the incidence of the tax
is fixed by the nature of the business conducted, while in
the latter it is fixed by the fact or act of transporting oil,
and thus no basis of comparison is afforded.

Trusting the foregoing will satisfactorily answer
your inquiries, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By s/Pat M. Neff, Jr.
Pat M. Neff, Jr.
Assistant

PMN:N:wc

APPROVED JULY 20, 1939
s/W.F. Moore
FIRST ASSISTANT
ATTORNEY GENERAL

Approved Opinion Committee By s/WRK Chairman